## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DULLAHAN | * | |
| 1250 Connecticut Avenue, N.W. | * | |
| Suite 200 | * | |
| Washington, D.C. 20036 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DEFENSE INTELLIGENCE AGENCY | * | |
| Washington, D.C. 20340 | * | Civil Action No. 10 -000238 (ESH) |
| | * | |
| and | * | |
| | * | |
| DEPARTMENT OF DEFENSE | * | |
| Washington, D.C. 20301 | * | |
| | * | |
| and | * | |
| | * | |
| OFFICE OF PERSONNEL | * | |
| MANAGEMENT | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C. 20415 | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## FIRST AMENDED COMPLAINT

Plaintiff John C. Dullahan, Irish émigré, retired U.S. Army Lieutenant Colonel of

more than 20 years of service, combat veteran of the Vietnam War, civilian deployer to

Iraq, and dedicated federal civil servant of more than 11 years, brings this lawsuit to

challenge the action of the U.S. Government, particularly the Defense Intelligence

Agency and Department of Defense, to arbitrarily and unceremoniously remove him from

civilian employment, as well as separately revoke his security clearance, amidst branding

him a risk to the national security interests of the United States. These actions were all

undertaken without explanation and devoid of due process of law. As a result, he is

broadly precluded from future employment with the Government he has served for decades until such time the Office of Personnel Management might decide his eligibility otherwise.

An American citizen, particularly one who has risked his life for his country over the course of five decades, is entitled to know the charge(s) against him. He is also entitled to notice and an opportunity to be heard, which are fundamental principles of due process of law. Yet this loyal American was, instead, shown the door in the so-called interests of national security, thereby rendering the actions of the defendants unconstitutional and in violation of everything the United States – and the Administration of President Barack Obama in particular - portends to stand for.

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court under 5 U.S.C. § 702, 28 U.S.C. §§ 1331, 1346 and 2201.

## PARTIES

2.  Plaintiff John C. Dullahan ("Dullahan") worked as an Intelligence Officer and supervisor at the Defense Intelligence Agency from 1987 – 1990 and 1997 – 2009. At the time of his termination in March 2009, Dullahan was serving as an Intelligence Officer. Several federal agencies have investigated his background and he has been favorably adjudicated numerous times in the past 40 years for access to classified information including up to the Top Secret/Sensitive Compartmented Information ("SCI") level and a number of especially sensitive Special Access Programs. He is also a preference eligible veteran pursuant to 5 U.S.C. § 2108.

3.  Defendant Defense Intelligence Agency ("DIA") is an agency of the United States Government as defined by 5 U.S.C. §§ 552a(a)(1), 701.

4.  Defendant Department of Defense ("DoD") is an agency of the United States Government as defined by 5 U.S.C. §§ 552a(a)(1), 701.

5.  Defendant Office of Personnel Management ("OPM") is an agency of the United States Government as defined by 5 U.S.C. §§ 552a(a)(1), 701.

## FACTS

6.  In 1967, Dullahan emigrated from Ireland to the United States for the purpose of enlisting in the United States Army.

7.  Following his enlistment in 1968, Dullahan was commissioned as an officer in 1970 and served in Vietnam as an Artillery Forward Observer.

8.  Dullahan became a U.S. citizen in 1973.

9.  In his final active duty Army assignment, Dullahan served from February 1990 to August 1992 as then-Chairman of the Joint Chiefs of Staff General Colin Powell's politico-military advisor for Eastern Europe, advising Powell and senior Pentagon policy-makers in the establishment and expansion of military contacts with the emerging democracies of Eastern Europe and fostering civilian control of their military forces.

10. As part of his Joint Staff responsibilities, in 1992, Dullahan prepared and accompanied General Powell and other Pentagon seniors on visits to their military counterparts in Eastern Europe. For his exceptional meritorious performance and "singularly distinctive accomplishments" during this critical period of reestablishment of U.S.-Eastern European military relations after more than 45 years, General Powell awarded Dullahan the Defense Meritorious Service Medal.

11. According to the citation, "During his tenure, and due in great part to his personal engagement, United States military relations with the countries of Poland, Hungary, Czechoslovakia, Romania, Bulgaria, and Albania have reached their highest point since 1945. The United States military's role as an active contributor to United States government policy in Eastern Europe was expanded significantly during Colonel Dullahan's service."

12. Dullahan retired from the U.S. Army after more than two decades of distinguished military service, including airborne and Ranger training with the 82nd Airborne Division, in 1992 with the rank of Lieutenant Colonel.

13. Having served at DIA from 1987 to 1990 on military assignment, Dullahan returned there as a civilian employee in 1997.

14. On February 17, 2009, Dullahan was placed on administrative leave and his clearance was suspended without explanation. Upon information and belief, DIA took this action based solely, or at least predominantly, on one or more polygraph examinations administered by DIA and/or the Federal Bureau of Investigation that explored Dullahan's lawful and authorized associations with other individuals that occurred as part of his federal employment. Upon further information and belief, DIA does not possess any substantive information that reasonably articulates any common sense reason that Dullahan poses a national security threat.

15. On or about March 17, 2009, then DIA Director LTG Maples personally issued two letters to Dullahan. The first letter stated that Dullahan's employment with DIA was terminated and the second letter notified him that his SCI access was immediately revoked. The revocation of Dullahan's SCI eligibility also resulted in the loss of all

collateral access as well. No substantive or detailed reason was given either for Dullahan's termination or clearance revocation. Both actions were based on 10 U.S.C. §1609, as well as other implementing provisions, the effect of which was to now broadly preclude Dullahan from future federal employment.

16. Dullahan was denied any opportunity to appeal his SCI clearance revocation.

17. Dullahan was, however, provided an opportunity to appeal his termination to the Secretary of Defense. Dullahan's termination was a distinct and separate action from that of his clearance revocation.

18. In both his termination and clearance revocation letters, LTG Maples merely cited to "National Security" without further explanation to justify DIA's actions.

19. On March 24, 2009, Dullahan was instructed to report to DIA. At a meeting with DIA officials he was given the choice of facing termination and revocation of his clearance with no opportunity for appeal, or quietly retiring with a full pension. If he chose the latter option, Dullahan was informed he would have the opportunity to reapply for a security clearance after one year. Again, when asked, DIA officials refused to provide even a generalized reason for Dullahan's loss of access or termination. Instead, they merely directed his attention to LTG Maples' termination letter that stated: "Circumstances have come to my attention that causes [sic] me to lose faith in your ability to maintain elements of character necessary to sustain eligibility for this access."

20. In order to assert his innocence, as any loyal American would do, Dullahan refused to retire and sought instead to clear his good name. Accordingly, Dullahan was terminated by DIA and his SCI access was revoked without any due process.

21. Thus, Dullahan was left with no *de jure* opportunity to appeal his clearance revocation and—without so much as notice of the charges against him—no *de facto* opportunity to appeal his termination.

22. On or about March 26, 2009, DIA placed within Dullahan's personnel file a Standard Form 50 ("Notification of Personnel Action") that indicated he was terminated for reasons of "National Security". This document is widely available to all federal agencies.

23. In or around the time DIA revoked Dullahan's security clearance and terminated his employment it directly uploaded or caused to be uploaded unfavorable and stigmatizing information concerning his character within the Joint Personnel Adjudication System (otherwise known as "JPAS"), as well as the SCATTERED CASTLES system. The information in these two databases (and variations thereof) is widely available to officials throughout the federal government as well as to thousands of authorized non-governmental third parties such as defense contractors. One or more private defense contractors have accessed Dullahan's JPAS records since he was terminated.

24. Upon information and belief, DIA and/or DoD have also disseminated unfavorable and stigmatizing information concerning Dullahan's character to certain Congressional committees, representatives and staff, as well as officials within OPM. This has the impact of further tarnishing Dullahan's reputation.

25. On March 27, 2009, Dullahan's primary attorney, Mark S. Zaid, who possesses a Secret-level clearance through the Department of Justice and has had authorized access to DIA classified information numerous times since 1993, requested access to all relevant

classified information pertaining to Dullahan's situation in order to "properly" or "adequately represent" his client pursuant to DoD Directive 5200.2-R, C3.4.4.6 (January 1987)(as amended), 32 C.F.R. § 154.16, and any other policy or provision governing access. That same day, Mr. Zaid asked DoD General Counsel Honorable Jeh Charles Johnson to provide details on how Dullahan could appeal his termination to the Secretary of Defense, the only avenue of challenge provided, as well as submitted an identical request for access to classified information.

26. By letter dated April 6, 2009, DIA denied Mr. Zaid's request for access to classified information relevant to Dullahan and declined to provide specific procedures for appeal. By letter dated April 20, 2009, the DoD also denied Mr. Zaid's request for access to classified information.

27. Shortly thereafter, further compounding his financial losses, Dullahan's application for unemployment compensation to the government of the District of Columbia, Department of Unemployment Compensation was rejected for the reason that, "Benefits cannot be paid at this time because there is an unresolved issue on [the unemployment compensation] claim." The decision was ultimately reversed but not before Dullahan suffered a cognizable financial loss.

28. By letter dated May 22, 2009, Dullahan submitted a timely written appeal to the Secretary of Defense challenging his termination. At the time of the filing of this First Amended Complaint, despite the passage of more than two years, no response has been received.

29. By letter dated November 19, 2010, Dullahan, via his undersigned counsel, wrote to OPM seeking guidance with respect to the application of 10 U.S.C. § 1609 (d), which

precludes Dullahan from either seeking or accepting "employment with any other department or agency of the United States" unless he "is declared eligible for such employment by the Director of the Office of Personnel Management."

30. By letter dated February 18, 2011, OPM responded and detailed its role in the process of determining Dullahan's eligibility for federal re-employment outside of DoD. It asserted that absent specific information concerning a job application it did not possess sufficient information to render any determination, and that it would be "contrary to law" were Dullahan to accept federal employment without OPM's clearance of his "eligibility." Upon information and belief, no written standards or policies exist that govern OPM's determination of or basis for "eligibility".

31. Thus, absent OPM's determination of his eligibility Dullahan is broadly precluded from being hired for any type of non-DoD federal employment, whether the position requires a security clearance or not.

32. Dullahan is also completely and broadly precluded in perpetuity from any future employment with DoD, whether the position requires a security clearance or not. No known mechanism or appeal process exists to remove this broad preclusion.

33. By letter dated May 2, 2011, Dullahan, via his undersigned counsel, requested in writing that OPM determine whether he is eligible for employment in another department or agency of the Government. OPM was informed of four specific non-DoD jobs that Dullahan had applied for and requested OPM issue a formal determination of his eligibility for employment in those positions and with those agencies. To date, OPM has failed to determine Dullahan is eligible for federal employment and until such time as that occurs he is permanently banned from any position.

34. Dullahan intends to continue to apply for non-DoD jobs for which he is qualified notwithstanding the fact that he has not been determined to be eligible.

35. Dullahan has also applied for positions within DoD that he is qualified for, but no responses have been received.

36. Dullahan intends to continue to apply to DoD jobs for which he is qualified notwithstanding the fact that he is permanently precluded from employment.

## FIRST CAUSE OF ACTION
### (FIFTH AMENDMENT LIBERTY INTEREST – DIA, DoD, OPM)

37. Dullahan repeats and realleges the allegations contained in paragraphs 7 through 36 above, inclusive.

38. By revoking Dullahan's security clearance and separately terminating his employment, DIA and DoD effectively stigmatized Dullahan's reputation. Both of these actions independently imparted a "status change" upon him that has implicated his liberty interests.

39. As a result of the actions of DIA and DoD, Dullahan has been falsely branded as a national security threat, lost his federal employment, had his reputation in the federal government and defense contractor community impugned, is permanently precluded from any future employment with DoD and is broadly precluded from all other non-DoD federal employment until such time as OPM determines his eligibility. This has resulted in foreclosing his freedom to take advantage of a range of employment opportunities and he has been precluded from further pursing his chosen career.

40. DIA and DoD have unconstitutionally constructively and broadly excluded Dullahan from participating in his chosen profession within the federal government generally and the national security and civilian defense community specifically. Dullahan

is precluded from employment with DoD and can only accept employment in a non-DoD position after OPM determines his eligibility.

41. Dullahan has applied for both non-DoD and DoD employment since his termination from DIA, and will continue to pursue such employment.

42. Pursuant to 5 C.F.R. § 732.401, Dullahan has requested OPM in writing to determine whether he is eligible for employment in another department or agency of the Government.

43. OPM's asserted procedures to determine eligibility are inconsistent with its adopted regulations under 5 C.F.R. § 732.401 and have the effect of broadly precluding Dullahan from future federal employment opportunities.

44. It would be contrary to law for Dullahan to accept federal employment without OPM's clearance of his eligibility.  Upon information and belief, Dullahan can be subject to a wide range of administrative, civil or criminal penalties.

45. DIA, DoD and/or OPM have already or will disseminate information, to include known inaccurate and false information, both classified and unclassified, that is maintained in their files about Dullahan that will adversely impact upon his reputation and harm or eliminate his chances for federal employment.

46. DIA, DoD and/or OPM has already disseminated false information concerning Dullahan to other agencies, as well as uploaded the information into federal databases that can be, and have been, accessed by private contractors.

47. As a result of the actions of one or more of the defendants, Dullahan has suffered adverse and harmful stigmatizing effects, including, but not limited to, lost, jeopardized or outright bans on present or future employment and/or financial opportunities.

## SECOND CAUSE OF ACTION
### (FIFTH AMENDMENT PROCEDURAL DUE PROCESS AND NAME CLEARING HEARING – TERMINATION OF EMPLOYMENT – DIA, DoD)

48. Dullahan repeats and realleges the allegations contained in paragraphs 7 through 36 above, inclusive.

49. By terminating Dullahan's employment without providing notice of the charges against him and adequate opportunity to refute such charges, DIA violated due process guarantees under the Fifth Amendment.

50. As no appropriate and/or effective opportunity was ever provided Dullahan for an opportunity to refute the allegations made against him or clear his name, he is entitled to notice of the charges against him, a name-clearing hearing and a written decision arising therefrom.

51. As a result, Dullahan has suffered adverse and harmful stigmatizing effects, including, but not limited to, lost, jeopardized or outright bans on present or future employment and/or financial opportunities.

## THIRD CAUSE OF ACTION
### (ADMINISTRATIVE PROCEDURES ACT – DoD)

52. Dullahan repeats and realleges the allegations contained in paragraphs 7 through 36 above, inclusive.

53. By letter dated May 22, 2009, Dullahan submitted a timely written appeal to the Secretary of Defense challenging his termination.

54. No final decision has been issued by the Secretary of Defense or his designee, despite the passage of more than two years.

55. DoD has unreasonably delayed issuing a final decision thereby violating

5 U.S.C. § 706 (1).

56. Until such time as informed otherwise, Dullahan is permanently precluded from

DoD employment.

57. As a result, Dullahan has suffered adverse and harmful stigmatizing effects,

including, but not limited to, lost, jeopardized or outright bans on present or future

employment and/or financial opportunities.

## FOURTH CAUSE OF ACTION
### (ADMINISTRATIVE PROCEDURES ACT – DIA)

58.  Dullahan repeats and realleges the allegations contained in paragraphs 7 through

36 above, inclusive.

59. The DIA must administer its polygraph examinations and utilize the results in

compliance with Department of Defense Directive Number 5210.48-R (January 1985),

Directive Number 5210.48 (January 25, 2007)(since superseded by DoD Directive

Number 5210.91 (February 4, 2011).

60. Pursuant to C1.1.3. polygraph examinations shall be considered as supplementary

to, not as a substitute for, other forms of investigation that may be required under the

circumstances. Moreover, no unfavorable administrative action will be taken solely on

the basis of a polygraph examination chart that indicates deception, except as provided in

paragraph C1.1.6. In taking the actions it did against Dullahan DIA violated this

provision.

61. Paragraph C1.4.1.prohibits the DIA from rendering a final administrative

determination based solely on the results of an analysis of the polygraph charts. In taking

the actions it did against Dullahan DIA violated this provision.

62. Assuming the DIA polygraph of Dullahan actually registered deception, DIA violated the provisions of C1.1.6 which states: "When deception is indicated by the examiner's interpretation of polygraph charts in polygraph examinations conducted under the provisions of subparagraph C1.2.2.1. and paragraph C1.3.3., below, an in depth interview of the subject will be undertaken by the examiner immediately following the running of the chart, to resolve any indication of deception. If the indication of deception cannot be resolved through such means, the subject will be so advised and the results of the examination forwarded to the requesting Agency. If, after reviewing the polygraph examination results, the requesting Agency determines that they raise significant question relevant to the subject's clearance or access status, the subject shall be given an opportunity to undergo additional examination by the examining Agency, using the same or a different examiner."

63. DIA failed to afford Dullahan with an opportunity to undergo an additional examination in violation of C1.1.6.

64. Upon information and belief, DIA failed to conduct a comprehensive investigation of Dullahan. To the extent any investigation did occur no derogatory information upon which an unfavorable administrative action may be independently based was obtained.

65. Upon information and belief, no DIA authority designated in paragraph C4.2.2. of Directive Number 5210.48-R issued a "written finding that the information in question is of such extreme sensitivity that access under the circumstances poses an unacceptable risk to the national security."

66. Additionally, no proper written notification was provided to Dullahan pursuant to C1.1.6.1. of Directive Number 5210.48-R subject, that "although the investigation that followed the indication of deception during the polygraph examination did not in and of itself provide an independent basis for denial of access, a determination to deny such access to the subject had been made, based upon the finding of the determining authority that access under the circumstances poses an unacceptable risk to the national security."

67. Additionally, DIA used the polygraph instrument as a psychological prop when it conducted its interrogation of Dullahan in violation of C3.4.4. of Directive Number 5210.48-R.

68. To the extent DIA relied upon the polygraph results obtained by another agency, it violated its applicable internal regulations.

69. The DIA is not permitted to violate Dullahan's constitutional rights, including but not limited to those under the First and Fifth Amendments, or violate its own regulations.

70. DIA was required to have followed Department of Defense Directive Number 5210.48 (January 25, 2007), which contains similar provisions to that cited above in Directive Number 5210.48-R. Additionally, however, DIA violated ¶4.4 of Directive Number 5210.48 which states that "The probing of a person's thoughts or beliefs and questions about conduct that has no security implication or is not directly relevant to an investigation are [sic] prohibited (such as religious beliefs and affiliations, beliefs and opinions regarding racial matters, and political beliefs and affiliations of a lawful nature)." By drawing conclusions and making personnel decisions based on Dullahan's lawful political beliefs and affiliations, DIA violated its own regulation.

71. DIA maintains a specific system of records within its Privacy Act system of records wherein information pertaining to Dullahan and his polygraph/security processing are filed. The DIA permits information and records from within this system to be disseminated as a routine use, under the appropriate circumstances, to other federal, state, and local agencies. Additionally, the DIA's violation of its internal regulations pertaining to its polygraph examination in Dullahan's case has resulted in inaccurate and harmful adverse information being maintained within databases available to third parties including defense contractors.

72. Dullahan plans to apply and already has applied for employment that requires a security clearance, and the inaccurate and harmful information placed by DIA, or which will be or has been disseminated by DIA, has and will have an adverse impact upon Dullahan.

73. DIA, its officers and employees, committed and undertook actions that were arbitrary, capricious and/or an abuse of discretion pertaining to Dullahan, including, but not limited to, conducting an improper polygraph examination and unfairly relying on the results of the polygraph examination, failing to conduct a comprehensive investigation, and taking actions that were unwarranted by the facts, unsupported by substantial evidence, in violation of internal regulations and federal statutes as set forth above, contrary to constitutional right, power, privilege, or immunity, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right thereby causing Dullahan to suffer legal wrongs under the Administrative Procedures Act.

74. As a result of DIA's actions, Dullahan has suffered adverse and harmful stigmatizing effects, including, but not limited to, lost, jeopardized or outright bans on present or future employment and/or financial opportunities.

### FIFTH CAUSE OF ACTION
### (PRIVACY ACT – DIA)

75. Dullahan repeats and realleges the allegations contained in paragraphs 7 through 36 above, inclusive.

76. DIA maintains records within one or more Privacy Act Systems of Records that pertain to Dullahan.

77. DIA failed to maintain records concerning Dullahan "with such accuracy, relevance, timeliness, and completeness" as would have been necessary "to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to" Dullahan that should have been "made on the basis of said record and consequently determinations were made which" were adverse to Dullahan thereby violating 5 U.S.C. § 552a(e)(5).

78. In failing to properly maintain said records, defendant DIA violated the provisions of 5 U.S.C. § 552a (g)(1)(C).

79. Upon information and belief, the DIA continues to maintain records pertaining to Dullahan in violation of 5 U.S.C. § 552a (g)(1)(C).

80. As a result of DIA's actions, Dullahan has been falsely branded as a national security threat, lost his federal employment, had his reputation in the federal government and defense contractor community impugned, is permanently precluded from any future employment with DoD and is broadly precluded from all other non-DoD federal employment until such time as OPM determines his eligibility. This has resulted in

foreclosing his freedom to take advantage of a range of employment opportunities and has been precluded from further pursing his chosen career.

81. The DIA, its employees and officers, to include one or more of the individual defendants, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

82. The DIA, its employees and officers, to include one or more of the individual defendants, acted intentionally or willfully in violation of Dullahan's privacy rights.

83. As a result of the actions of one or more of the defendants, Dullahan has suffered adverse and harmful stigmatizing effects, including, but not limited to, lost, jeopardized or outright bans on present or future employment and/or financial opportunities.

WHEREFORE, John C. Dullahan requests that the Court award him the following relief:

(1)    Declare and find that the defendants violated Dullahan's right to due process under the Fifth Amendment to the Constitution, and require the defendants to provide Dullahan with notice of the charges, a name clearing hearing in which he can refute and/or challenge the accuracy of the information underlying the fact-based findings that resulted in the revocation of his clearance access and/or employment termination and any other appropriate relief to be determined in future proceedings;

(2)    Declare and find that the preclusion from DoD employment, as well as any other non-DoD employment absent an eligibility determination from OPM, violates Dullahan's Due Process and liberty interest rights under the Fifth Amendment to the Constitution;

(3)    Require defendants DIA and DoD to explain *in camera, ex parte* the reason(s) for Dullahan's termination of employment;

(4)    Require defendant DIA to explain *in camera, ex parte* the reason(s) for the revocation of Dullahan's security clearance;

(5)    Appoint an independent expert to review the reason(s) for the revocation of Dullahan's security clearance and his termination of employment and make appropriate recommendations to the Court;

(6)    Declare and find that defendant DIA violated the Privacy Act by failing to make reasonable efforts to assure that such records regarding Dullahan are accurate, complete, timely and relevant prior to dissemination, and award any damages in an amount not less than $1,000, or other appropriate relief, that are deserved there from;

(7)    Declare and find that the DIA's use of and reliance on the polygraph violated his constitutional rights and applicable internal regulations;

(8)    Require defendant OPM to determine Dullahan's eligibility for federal employment;

(9)    Require defendant OPM to properly follow 5 C.F.R. § 732.401;

(10)   Require defendant OPM to promulgate policy and/or guidance setting forth reasonable standards to permit an eligibility determination for federal employment;

(11)   Declare and find IC Policy Guidance 704.3 (D)(2)-(5), 10 U.S.C. § 1609 and all regulations based thereon, and Section 5.2(d) of Executive Order 12968 and all regulations based thereon unconstitutional;

(12)   Invoke its equitable powers to expunge all records or information maintained by the defendants that are inaccurate, derogatory or infringe upon Dullahan's express or implied constitutional or statutory rights;

(13)  Refer those DIA officials responsible for violating the Privacy Act for prosecution under 5 U.S.C. § 552a(i)(1);

(14)  Award Dullahan the costs of the action and reasonable attorney fees under the Equal Access to Justice Act, the Privacy Act or any other applicable law; and

(15)  Grant such other relief as the Court may deem just and proper.

Date:   June 10, 2011

Respectfully submitted,

/s/
_____
Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Ilana S. Greenstein, Esq.
D.C. Bar #MD9622
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com
Brad@MarkZaid.com
Ilana@MarkZaid.com